No.  09-6128

IN THE UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT
_____

HILDA L. SOLIS,
Secretary of Labor,

Plaintiff-Appellant,

v.

LAURELBROOK SANITARIUM AND
SCHOOL, INC.,

Defendant-Appellee.
_____

On Appeal from the United States District Court
For the Eastern District of Tennessee
_____

BRIEF FOR THE LAURELBROOK
SANITARIUM AND SCHOOL, INC.
_____

DEBORAH A. AUSBURN
Georgia Bar No. 028610
Attorney for Defendant-Appellee

DAVID J. MYERS
Georgia Bar No. 533072
Attorney for Defendant-Appellee

FSB FisherBroyles, A Limited Liability
Partnership
2016 Bascomb Carmel Road
Woodstock, GA  30189

## CORPORATE DISCLOSURE STATEMENT

Laurelbrook Sanitarium and School, Inc., has no parent corporation. It has no stocks or shares; therefore, no publicly-held corporation owns any stocks or shares in Laurelbrook.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENT ............................................... i

TABLE OF CONTENTS ............................................................. ii

TABLE OF AUTHORITIES .........................................................v

STATEMENT REGARDING ORAL ARGUMENT ................................. vii

STATEMENT OF ISSUES ..........................................................1

STATEMENT OF THE FACTS ......................................................1

    A.    Laurelbrook is an Accredited School with a *Bona Fide* Vocational Program ....................................................1

    B.    Laurelbrook History and Philosophy .........................................3

    C.    Laurelbrook's Academic and Vocational Schedule ..................6

    D.    Laurelbrook's Sanitarium ........................................................7

    E.    Testimony of Disgruntled Former Students ..............................8

    F.    Laurelbrook's Safety Record ..................................................10

    G.    Effect of FLSA Regulations on Laurelbrook and Other Vocational Schools ........................................................12

SUMMARY OF ARGUMENT ..................................................14

ARGUMENT ...................................................................................17

I.  FLSA Has Never Applied to Students of Bona Fide
    Vocational Schools: the *Portland Terminal* Factors
    Are Irrelevant in this Case .......................................................17

    A.  As the Supreme Court held in *Portland Terminal*,
        Vocational School Students Are Not Employees...........17

    B.  There is No Precedent for the Secretary's Attempt
        To Apply FLSA to Students at an Accredited
        Vocational School ........................................................25

II. The  District Court Used the Proper Analysis for
    Determining that Laurelbrook's Students Are Not
    Employees...................................................................................26

    A.  The Secretary's Test Is Entitled to No Deference
        From This Court ............................................................26

    B.  The Best Analysis Focuses on the Primary Benefit
        Of the Program .............................................................29

    C.  The Primary Beneficiaries of Laurelbrook's Program
        Are Laurelbrook's Students..........................................37

III. Even Under the Secretary's Six-Factor Test, the FLSA Does
     Not Apply to Laurelbrook's Students .......................................44

    A.  Laurelbrook Is a Valid Career and Technical
        And Education Program, Fully Recognized by the
        State of Tennessee ........................................................45

    B.  Laurelbrook's Vocational training Program Is for
        The Benefit of Its Students ...........................................51

    C.  The Students Do Not Displace Regular Employees
        At Laurelbrook and Work Under Their Close
        Supervision ...................................................................51

D.   Laurelbrook Derives No Immediate Advantage
From Teaching Its Students, and the Students
Usually Impede Its Operations ........................................55

E.   Students Are Not Entitled to a Job at Laurelbrook
Upon Graduation ...........................................................55

F.   Students Are Not Entitled to Wages for Their
Vocational Training.........................................................56

IV.   The Relief the Secretary Seeks Violates the Free Exercise
Clause of the First Amendment and the Religious Freedom
Restoration Act ........................................................................57

V.   The Secretary's Case Does Not Meet the Standard for
Injunctions ...............................................................................64

CONCLUSION ...........................................................................................66

Certificate of Compliance ...........................................................................68

Certificate of Service...................................................................................69

Addendum ...................................................................................................70

# TABLE OF AUTHORITIES

**Cases**

*Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632 (6th Cir. 2004)...............................26, 28

*Atkins v. General Motors* Corp., 701 F. 2d 1124 (5th Cir. 1983)....................18, 24, 33, 38

*Blair v. Wills*, 420 F.3d 823 (8th Cir. 2005) ............................................................24, 34, 35

*Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381 (6th Cir. 2005) ..............................61

*Bobilin v. Bd. of Ed., State of Hawaii*, 403 F.Supp. 1095 (D. Haw. 1975)................20, 24

*Brock v. Wendell's Woodwork, Inc.*, 867 F.2d 196 (4th Cir. 1989)....................................40

*Carter v. Mayor & City Council of Baltimore City*, 2010 U.S. Dist. LEXIS 18477 (D. Md. Mar. 2, 2010)...........................................................................................................49

*Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991)...................................33

*Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990)........................40, 62

*Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977) ........................................33

*Employment Div. v. Smith*, 494 U.S. 872 (1990) ..............................................................58

*Ginsberg v. New York*, 390 U.S. 629 (1968) ....................................................................61

*Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260 (1988)............................................61

*Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294 (6th Cir. 1998) .............29

*Lane v. Carolina Beauty Systems, Inc.*, 1992 LEXIS 15338 (M.D.N.C. July 2, 1992)... 18, 24, 50

*Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992.........................................................33

*Marshall v. Baptist Hospital, Inc.*, 473 F. Supp. 465 (M.D. Tenn. 1979), *rev'd*, 668 F.2d 234 (6th Cir. 1981) ..............................................................................33

*Marshall v. Regis Educ'l Corp.*, 666 F.2d 1324 (10th Cir. 1981) ...................23, 24, 34, 35

*McLaughlin v. Ensley*, 877 F.2d 1207 (4th Cir. 1989) .....................................................33

*McLaughlin v. McGee Bros. Co., Inc.*, 681 F.Supp. 1117 (W.D.N.C. 1988)............21, 22

*Meyer v. Nebraska*, 262 U.S. 390 (1923) .........................................................................61

*OfficeMax, Inc. v. United States*, 428 F.3d 583 (6th Cir. 2005) ................................26, 28

*Pierce v. Society of Sisters*, 268 U.S. 510 (1925) .......................................................58, 61

*Reich v. ConAgra, Inc.*, 987 F.2d 1357 (8th Cir. 1993)....................................................45

*Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023 (10th Cir. 1993).........28, 34, 38, 49

*Reich v. Shiloh True Light Church of Christ*, 895 F.Supp. 799 (W.D.N.C. 1995)...........21

*Rosales-Garcia v. Holland*, 322 F.3d 386 (6th Cir. 2003) ...............................................28

*Rutherford Food Corp. v. McComb*, 331 U.S. 722 (1947). .............................................. 32

*Sherbert v. Verner*, 374 U.S. 398 (1963) ...................................................................... 59

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ............................................................... 26

*Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590  (1944) ........................................................................................ 32

*Tony & Susan Alamo Fnd'n v. Sec'y of Labor*, 471 U.S. 290 (1985) ......................... 33, 40

*Troxel v. Granville*, 530 U.S. 57 (2000). ...................................................................... 61

*University of Great Falls v. NLRB*, 278 F.3d 1335 (D.C. Cir. 2002) ............................ 29

*Walling v. Jacksonville Terminal Co.*, 148 F.2d 768 (5th Cir. 1945), ......................... 30

*Walling v. Nashville, C & St. L. R. Co.*, 155 F.2d 1016 (6th Cir. 1946), *aff'd*, 330 U.S. 158 (1947) ............................................................................... 30, 31

*Walling v. Portland Terminal Co.*, 330 U.S. 148 (1947) .............................. 15, 17, 18, 30

*Western Union Tel. Co. v. McComb*, 165 F.2d 65 (6th Cir. 1947), ........................... 31, 32

*Williams v. Strickland*, 87 F.2d 1064 (9th Cir. 1996) .................................................. 34

*Wisconsin v. Yoder*, 406 U.S. 205 (1972) ................................................................... 59, 60


**Statutes**

29 U.S.C. § 203(e)(1) .................................................................................................... 26

42 U.S.C. § 2000bb-1 ................................................................................................... 57


**Other Authorities**

29 C.F.R. § 570.55(c)(2) ............................................................................................... 48

Op. Wage-Hour Admin'r No. 1849, 1995-99 Wages Hours (CCH) 32,671 (May 1, 1996) ....................................................................................................... 26, 46

Op. Wage-Hour Admin'r No. 2334, 2002-04 Wages Hours (CCH) 31,071 (September 5, 2002) ................................................................................................ 27, 29

Op. Wage-Hour Admin'r No. ___, 1975 Westlaw 40999 (October 7, 1975) ................ 46

Op. Wage-Hour Admin'r No. 249, 1961-66 Wages Hours (CCH) 30,843 (April 11, 1964) ....................................................................................................... 27

Op. Wage-Hour Admin'r No. 638, 1966-69 Wages Hours (CCH) 30,628 (July 18, 1967) ......................................................................................................... 27

Op. Wage-Hour Admin'r No. 650, 1966-69 Wages Hours (CCH) p. 30, 641 (September 13, 1967) ................................................................................................ 27

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Laurelbrook Sanitarium and School, Inc. requests oral argument in this case.  The issues concern the applicability of the Fair Labor Standards Act to a properly accredited vocational school, and Laurelbrook believes oral argument would assist this Court in its analysis.

## STATEMENT OF ISSUES

Whether Laurelbrook is an accredited school that can continue to operate a vocational program, as approved by the Tennessee Department of Education and as mandated by its sincere religious beliefs, or whether it is merely a business that must shut down its state-approved vocational program to comply with the FLSA.

## STATEMENT OF THE FACTS

Throughout this litigation, the Secretary has failed either to understand or to acknowledge important facts. Most of those facts center on Laurelbrook's educational program, key details of which continue to elude the Secretary.

**A.    Laurelbrook Is an Accredited School with a *Bona Fide* Vocational Program**

Contrary to the Secretary's representations, Appellant's Brief at 4, Laurelbrook has been accredited since the 1970's. At that time, Laurelbrook sought approval from the Southern Union Conference of Seventh-day Adventists, which in turn received approval as an accrediting agency from the Tennessee Department of Education ("TDOE"). DX 4, App. at 223; R. 82, Tr. 141:19-142:22. Through that Conference, the TDOE accredited Laurelbrook's entire program, including its vocational training. *Id.*   Within

1

the past decade, the Adventist denomination decided to approve only denominational schools and not self-supporting schools such as Laurelbrook. R. 82, Tr. 142:23-143:24; R. 80, Tr. 934:23-935:24. The self-supporting schools in Tennessee then formed the E.A. Sutherland Education Association ("EASEA"), so that the schools could continue to have state accreditation. R. 82, Tr. 143:25-144:5; R. 80, Tr. 935:25-936:1.

The TDOE approves non-public schools in several different categories. R. 80, Tr. 961:24-962:9. The state accredits schools in Category 2, such as Laurelbrook, via authorized agencies -- i.e., the state approves accrediting agencies, which in turn accredit member schools. R. 80, Tr. 962:13-14, 20-963:3. Although the State of Tennessee allows religious schools to operate without oversight (as "Category 4" schools), R. 80, Tr. 963:4-6, Laurelbrook chose to seek accreditation because it wanted "to be the best" and to give its students benefits such as transferable credits. R. 82, Tr. 144:6-145:8.

Laurelbrook was a charter member of EASEA. R. 82, Tr. 145:12. ESEA applied to the TDOE for approval as an accrediting organization in June 2002. R. 83, Tr. 419:15-21. The TDOE approved EASEA effective 2002, R. 83; Tr. 420:8-421:4; 475:14-476:2, and renewed that approval in 2008, R. 78, Tr. 476:8-16. Once approved, EASEA began the process of

accrediting its member schools.  R. 83, Tr. 421:8-21.  Although the process may take some time, the State of Tennessee considers a school's accreditation to be retroactive to the time of its application.  R. 83, Tr. 421:25-422:9, 426:7-21.  Laurelbrook applied for EASEA accreditation in 2004 and received it in 2006.  R. 78, Tr. 479:1-8, 480:18-19.

The TDOE, Career and Technical Education ("CTE") Division, has approved transfer credits for 16 of EASEA's 25 vocational courses.  R. 80, Tr. 1049:12-18; DX 37, App. at 173.  It approved the remaining nine courses as "special courses."  *Id*.  Credits for special courses transfer at the discretion of the transferee school, R. 78, Tr. 495:5-496:14, R. 80, Tr. 1000:12-20, 1001:5-17.  Special courses require TDOE approval every year, but do not affect a school's accreditation. DX 39 at ¶¶ 9-10, App. at 257.

The TDOE has worked closely with EASEA and has no concerns about its work as an accrediting association.  R. 80, Tr. 1050:15-1051:9.  Will Lewis, Director of Curriculum and Instruction for the CTE Division, considers Laurelbrook's program to be a valid CTE program.  R. 80, Tr. 1052:7-10.

## B.    Laurelbrook History and Philosophy

The Secretary gives insufficient weight to the religious and educational goals of Laurelbrook.  Although Laurelbrook has never claimed

that its religious beliefs exempt it from applicable regulations (such as accreditation, *supra*, pp. 1-3), any evaluation of its program must account for its bedrock principles.

The staff and students at Laurelbrook (and Seventh-day Adventists as a whole) believe that founder Ellen G. White had a prophetic gift. R. 82, Tr. 129:13-21, 25-130:4; R. 80, Tr. 1180:5-14.   Mrs. White wrote, in establishing the philosophy of Seventh-day Adventist education, that students are to be instructed, not only in academic subjects, but in practical skills and vocational training, including specifically in sanitariums connected with Seventh-day Adventist schools.  *The Madison School* (1946)*, DX. 31 pp. 33-34, App. at 227; *Education* (1903)*, DX 34 p. 215, App. at 229.  According to Mrs. White, "Students who have gained book knowledge without gaining a knowledge of practical work cannot lay claim to a symmetrical education."   *Counsels to Parents, Teachers and Students* (1913), DX. 35 p. 307, App. at 230.

Educators following Mrs. White's teaching started the Madison School, which was designed to have students learn vocational skills by working alongside instructors.  R. 82, Tr. 130:20-131:6; R. 81, Tr. 1178:4-1179:24.  Laurelbrook is a school after the Madison Order.  *Id.* Laurelbrook makes no distinction between academic and vocational instructors; every

academic teacher must also participate in vocational training.  R. 81, Tr. 1249:7-20; R. 78, Tr. 596:9-22, 599:6-18, 609:6-15, 610:12-20, 614:23-615:7; R. 81, Tr. 1250:1-7.  Laurelbrook endeavors to provide character training, teach responsibility, and give students vocational skills they can use when they leave the school.  R. 82, Tr. 134:21-135:9; R. 81, Tr. 1179:2-6; 1182:15-21.  As one of Laurelbrook's founders described it, "the primary reason for the school is to teach young people a way of life."  R. 81, Tr. 1182:15-16.

Laurelbrook teaches vocational skills not just in classroom or laboratory settings, but by actually doing the tasks being taught – for example, teaching students masonry by building school buildings.  R. 81, Tr. 1183:10-14.  "[T]he model of Laurelbrook, is learning through doing."  R. 81, Tr. 1183:17-18.  In Seventh-day Adventist educational philosophy, "everything that is happening to a student is curriculum."  R. 81, Tr. 1218:21-23.

In fulfillment of Mrs. White's teachings, in the early 1950s, Laurelbrook added the Sanitarium to its program to give the students opportunities to learn "how to treat the sick and to care for the injured." *The Madison School* (1946)*, DX 31 p. 33, App. at 227; R. 81, Tr. 1179:9-12. The close connection between Seventh-day Adventist, Madison-type schools

and sanitariums has existed since at least 1904. R. 81, Tr. 1179:16-22; 1206:23-1207:14.

The Seventh-day Adventist philosophy of education has not changed significantly in the 100-plus years that Seventh-day Adventists have been operating their schools.  R. 81, Tr. 1206:18-22.  Parents send their children to Laurelbrook knowing that their children will be participating in the school's integrated academic and vocational program.  R. 81, Tr. 1242:8-1243:6; PX 6, 7, & 12, App. at 5, 12 & 32.  Numerous Laurelbrook staff members and alumni testified to their belief in Mrs. White's philosophy of education.    R. 82, Tr. 127:2-23 (Hess); R. 83, Tr. 346:9-10, 15-10 (Frechette); R. 78, Tr. 578:21-24, 579:3-4, 11-15 (Westfall); R. 79, Tr. 691:5-16, 692:13-18 (Brandt); R. 79 Tr. 733:4-17 (Herra); R. 79, Tr. 764:9-14 (Ubiera); R. 72, Tr. 1089:23-1090:4 (Shull); R. 72, Tr. 1136:5-16 (Graham); R. 72, Tr. 1141:8-10, Tr. 1142:21-24 (Schmidt); R. 72, Tr. 1149:18-22 (Adams); R. 72, Tr. 1155:24-1156:15, 1166:9-15 (Oxentenko).

## C.    Laurelbrook's Academic and Vocational Schedule

Laurelbrook believes that four-hour blocks are essential for vocational training because, as Charles Hess, President of Laurelbrook, explained, "[W]e're trying to teach the whole person." R. 82, Tr. 135:25-136:23.  The

character training aspect of Laurelbrook's education requires blocks of time for the instructors to work with the students.  R. 82, Tr. 136:34-137:10.

Students receive periodic grades from their academic and vocational instructors.    The instructors also evaluate such factors as attitude, promptness, and neat attire, and assign a citizenship grade. *See, e.g.,* PX 6 at 7-9, App. at 186.  Laurelbrook administrators average the grades from all three areas (academic, vocational, and citizenship) to arrive at the student's grade point average ("GPA").  PX 6 at 25, App. at 8; R. 82, Tr. 153:16-155:15; R. 83, Tr. 341:19-23.

## D.    Laurelbrook's Sanitarium

Laurelbrook assigns its students, as part of their vocational training, to the Sanitarium kitchen and housekeeping departments, as well as grounds maintenance. R. 82, Tr. 43:12-14, 43:23-44:2; 44:14-23; 45:19-21; 47:1-48:1. Laurelbrook students who are 16 years of age may participate in the school's Certified Nursing Assistant ("CNA") training, R. 82, Tr. 47:5-10, which the State of Tennessee has approved.  R. 83, Tr. 367:25-368:3. Consistent with its religious beliefs, Laurelbrook considers the Sanitarium training to be an essential part of the school's educational function.  R. 83, Tr. 411:16-18; R. 81, Tr. 1207:2-14.

Tennessee CTE standards include a course in support services at a health care facility. DX 38-Q, App. at 177. Students learn how to deliver a high-quality meal within a health-care setting, and how to operate equipment used in the upkeep of a facility, including grounds maintenance. R. 80, Tr. 1084:9-1085:12. When students finish this program, they would be able to work in grounds keeping or housekeeping at a health care facility. R. 80, Tr. 1085:13-21. Of the 10 standards included in that CTE course, Laurelbrook teaches at least 8 in its Environmental Services and Culinary Arts programs, including assignments at the Sanitarium. R. 81, Tr. 1250:17-24.

## E.    Testimony of Disgruntled Former Students

The Secretary claims throughout her brief that Laurelbrook does not supervise its students and assigns them "as needed." The main[1] basis for that claim is the testimony of two former students. Their testimony was not credible and the District Court rightly ignored it. Joseph Bear spent less than one year at Laurelbrook, R. 82, Tr. 172:18-23, and could not remember the correct length of the vocational rotations. R. 81, Tr. 204:15-23. He had

---

[1]    Laurelbrook does not dispute that it provided less supervision to students on the boiler shift. However, the school's policy was to never assign students younger than 16 to the boiler, R. 78, Tr. 517:3-5, 534:18-535:1; R. 81, Tr. 1236:11-14, and, after hearing concerns from the TDOE, R. 80, Tr. 970:4-17, stopped assigning minors entirely. R. 78, Tr. 540:25-541:2. The Secretary's request for injunctive relief looks only to future activity, and there is no need for an injunction against an already-discontinued practice.

several significant disciplinary violations during the short time that he was at Laurelbrook.  R. 82, Tr. 218:25-219:25.  The school expelled him.  R. 82, Tr. 204:8-11; R. 81, Tr. 1233:23.

Bradley Bear, Joseph's brother, also attended Laurelbrook.  R. 82, Tr. 233:24, 230:25-231:6.  He could not remember when he started or when he left.  R. 83, Tr. 267:16-268:13.  He also could not remember what hours he worked in the vocational program, or how many rooms he cleaned at the Sanitarium, R. 83, Tr. 277:6-279:1.  He too had a series of disciplinary problems at Laurelbrook, although "outside of Laurelbrook's vocational training program," he had "no recollection of events" at the school.  R. 83, Tr. 282:9-11, 22-24.  He testified that he did not "remember any specifics outside of the Laurelbrook academic program as far as vocational training."  R. 83, Tr. 289:17-18.  He too was expelled from Laurelbrook.  R. 83, Tr. 210:10-11; R. 72, Tr. 1132:19-20.

The Secretary presented no other testimony about a lack of supervision.  The two staff members the Secretary quotes actually testified quite differently from the Secretary's representations.  Charles Hess did not say that students work during breaks in order to keep the school and Sanitarium running.  He actually testified that the system is necessary "in *our vocational program* – to keep everything on an even keel."  R. 82, Tr.

64:23-25.  Similarly, Keith Wellman, the Director of the Sanitarium, did not testify that the goal is for students to work the same job as adult CNAs, but to be as capable as they are.  R. 83, Tr. 405:15-18, 406:22-407:13.

Laurelbrook, by contrast, presented ample evidence that adult instructors supervise the students.  R. 79, Tr. 754:23-755:3; R. 82, 139:20-140:15.  Indeed, the school's guiding principle is that students should work alongside instructors.  R. 82, Tr. 130:20-131:6; R. 81, 1178:4-1179:24.

## F.    Laurelbrook's Safety Record

The Secretary distorts Laurelbrook's safety record and understates the ability of the TDOE to ensure safety in vocational programs. Paul Frechette testified that in his 23 years as Business Manager at Laurelbrook, 90 to 95 percent of the student accident claims have been for injuries from recreational activities.  R. 83, Tr. 302:22-23, 303:1-2, 343:8-13.  In the last 10 years, Mr. Frechette could remember fewer than 15 injuries, all minor, in the vocational program.  R. 83, Tr. 343:22-344:12.  Gladys Ferguson, school nurse for almost 20 years, could not remember any injury in the vocational program other than "bumps and bruises."  R. 79, Tr. 749:9-14, 23-750:8. Laurelbrook has never had any injuries to students in the boiler room.  R. 82, Tr. 152:14-16.

At trial, the Secretary was able to identify only two students whose injuries might have been prevented by FLSA limitations on hazardous occupations. R. 79, Tr. 856:19-864:18; PX 11 & 46, App. at 26 & 74. Each of those injuries was minor – no more serious than those that public school students receive in extra-curricular activities. The one student who sought medical help for a finger injury, unknown to Laurelbrook, R. 83, Tr. 344:23-345:7, was sent home with Tylenol and instructions for "ice and elevation." PX 46, App. at 208.

In 2006, Ron Blalock, a representative of the TDOE, visited Laurelbrook. R. 80, Tr. 969:13-970:3. He expressed concerns that Laurelbrook's boiler and rock quarry might be unsafe for students. R. 80, Tr. 970:4-17, 1044:15-1045:6, 1048:2-4. In February 2008, representatives of the TDOE visited Laurelbrook and confirmed that the school no longer allows students to work in the boiler room or the quarry. R. 80, Tr. 974:3-23, 1047:11-21, 1047:25-1048:7.

The Tennessee CTE Division monitors safety in schools throughout the state. That division has found that if schools teach safety standards within the curriculum, the students and teachers are protected. R. 80, Tr. 1047:2-10. The curriculum guidelines of both Laurelbrook and EASEA emphasize safety standards. R. 78, Tr. 490:2-4, 490:20-491:1, 537:6-538:18;

11

*See, e.g.*, DX 1-1 to 1-4, App. at 209.  EASEA adopted its safety standards from the Tennessee CTE standards, many of which incorporate OSHA standards. R. 78, Tr. 490:6-19.

The Secretary's continued insistence that students worked on the Laurelbrook campus without fall protection, Appellant's Brief at 16, is inexplicable.  The project supervisor testified unequivocally that he, his crew, and Laurelbrook students complied with all OSHA regulations about fall protection systems.  R. 78, Tr. 628:22-629:6; R. 72, Tr. 1097:22-1100:7. The Secretary never presented contrary evidence.

In sum, the District Court was not clearly erroneous when it found that Laurelbrook "adequately supervises its students and provides adequate and reasonable safeguards to protect students from hazardous activities", and that Laurelbrook "is committed to the safety of its students, is safety conscious, and has performed reasonably well in making sure that students performing work are safe."  R. 84, Memorandum, Findings of Fact at ¶¶ 42-43; 2009 U.S. Dist. LEXIS 60413 at *7.

## G.    Effect of FLSA Regulations on Laurelbrook and Other Vocational Schools

The trial testimony was unanimous that, if FLSA regulations apply to secondary schools, high school vocational programs are not possible. R. 80,

Tr. 957:17-21, 1021:12-21.  The regulatory limitations on students younger than 16 would mean that neither Laurelbrook nor any other vocational school could have hands-on training during school hours for those students. R. 82, Tr. 156:16-157:15, R. 79, Tr. 849:22-850:9. The limitations on hazardous occupations would prohibit the majority of CTE classes.  R. 82, Tr. 157:17-23.  Students younger than 18 would not be able to use a skill saw, miter saw, or electric drill, or learn any building trade. R. 82,  Tr. 158:24-159:19, R. 78, Tr. 544:18-546:6. In fact, FLSA regulations would prohibit Laurelbrook from teaching its students to use even hand tools to create birdhouses or bookshelves, because the Secretary deems such activity to be "manufacturing." R. 79, Tr. 846:13-849:14, R. 80, Tr. 869:18-24.

Most Tennessee CTE courses require the use of tools and mastery of skills that the FLSA prohibits.  *See, e.g.*, DX 38-B, App. at 231, Standards 3.0 & 5.0 (Agricultural Mechanics and Maintenance); DX 38-C, App. at 233, Standards 3.0 & 4.0 (Agricultural Power and Equipment); DX 38-D, App. at 236, Standards 5.0-9.0 (Carpentry I); DX 38-E, App.  at 238, Standards 4.0-9.0 (Carpentry II); DX 38-G, App. at 241, Standard 5.0 (Culinary Arts I); DX 38-J, App. at 243, Standards 5.0-11.0 (Electrical I); Exh. 38-K, App. at 247, Standards 4.0 & 10.0 (HVACR I); DX 38-M, App.

at 250, Standard 2.0 (Masonry I); DX 38-O, App. at 252, Standards 5.0-7.0 (Welding); DX 38-P, App. at 254, Standards 3.0-7.0 (Advanced Welding).

Without hands-on experience, neither public nor private school schools can meet state CTE standards.  R. 80, Tr. 1021:6-9, 1055:5-18, 1056:1-9.  A vocational program in Tennessee cannot obtain transfer credit if it does not offer actual experience in using tools. R. 80, Tr. 1062:17-1064:2. Laurelbrook (and other vocational schools) cannot have a *bona fide* vocational program if the FLSA regulations apply.

## SUMMARY OF ARGUMENT

Laurelbrook is a Seventh-day Adventist vocational boarding school. The Secretary charges that Laurelbrook actually is a business employing illegal child labor.  Laurelbrook argues, and the District Court agreed, that it is a *bona fide* vocational school, and therefore not within the reach of the FLSA.

More than 50 years ago, the United States Supreme Court made clear that the FLSA does not apply to vocational schools:  "Had these trainees taken courses . . . in a public or private vocational school, . . . it could not reasonably be suggested that they were employees of the school within the meaning of the Act."  *Walling v. Portland Terminal Co.*, 330 U.S. 148, 152-

53 (1947). [2]  Faced with that limitation, the Secretary takes a schizophrenic approach to Laurelbrook, alternately ignoring or sneering at its educational bona fides.  The Secretary refuses to admit the plain facts that the District Court found:  Laurelbrook is accredited, most of its vocational credits are transferable, and its vocational program is intricately interwoven with its educational and religious values.  Significantly, the Secretary has never before attempted to enforce the child labor laws against an accredited vocational school, and the few cases brought by private parties have found the FLSA inapplicable.

Even under the Secretary's approach – ignoring Laurelbrook's status as a vocational school and analyzing it as a workplace – the students are trainees. The Secretary's restrictive six-factor test is entitled to no deference from this Court, and the District Court applied the correct legal standard by focusing on the primary benefit of the training. The District Court also reached the correct conclusion:  the students, not the school, are the primary beneficiaries of the vocational program.  Even if this Court limits its analysis to the Secretary's test, Laurelbrook established at trial that its vocational program satisfies all six factors.  At a minimum, whether the students are

---

[2]     Throughout this Brief, all emphasis is added to and all citations are omitted from quotations unless otherwise noted.

employees depends on the District Court's findings of fact, which are supported by overwhelming evidence and are not clearly erroneous.

Application of the FLSA, where the TDOE has already accredited Laurelbrook and approved its vocational program, violates the Free Exercise Clause and the Religious Freedom Restoration Act. The FLSA and associated regulations would significantly burden Laurelbrook's religious exercise. Less restrictive means are readily available to serve any compelling governmental interest in the education and safety of Laurelbrook's students, through the existing oversight of the TDOE and its accrediting process. The sufficiency of this alternative is demonstrated conclusively by the Secretary's decision not to apply the FLSA to any other accredited vocational school in Tennessee.

Finally, the Secretary's case does not meet the standard for injunctions. The Secretary has no evidence that Laurelbrook intends to defy any court ruling. Laurelbrook has simply pointed out the reality that compliance will require shutting down most, if not all, of its vocational program. Laurelbrook will lose its CTE approval, and any ability to offer transfer credits. Such a result is inevitable when the Secretary insists on applying workplace rules to a high school vocational program.

## <u>ARGUMENT</u>

I.     **FLSA Has Never Applied to Students of Bona Fide Vocational Schools; the *Portland Terminal* Factors Are Irrelevant in this Case.**

The Secretary's appeal downplays the singular fact in this case: Laurelbrook is a bona fide, accredited vocational school.

The Secretary criticizes what she believes to be Laurelbrook's educational deficiencies, but does not explain what expertise she has that enables her to second-guess the state's accreditation decisions.   The fact that the TDOE has approved Laurelbrook's vocational program should resolve this litigation.

**A.     As the Supreme Court Held in *Portland Terminal*, Vocational School Students Are Not Employees.**

In the seminal *Portland Terminal Co.* case, a vocational school was the Supreme Court's primary example of a situation outside the scope of the FLSA:

> The definition "suffer or permit to work" was obviously not intended to stamp all persons as employees who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.  <u>Otherwise, all students would be employees of the school . . . they attended</u> . . . . But there is no indication from the legislation now before us that Congress intended to outlaw such relationships as these. . . . [The terms "employ" and "employee"], broad as they are, . . . cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives

> him aid and instruction. <u>Had these trainees taken courses</u> in railroading <u>in a public or private vocational school</u>, wholly disassociated from the railroad, <u>it could not reasonably be suggested that they were employees of the school within the meaning of the Act</u>.

330 U.S. at 152-53.

Thus, there is no need to engage in an extended analysis of whether students at a particular vocational school are employees under the FLSA. The Supreme Court already has answered that question – vocational school students engaging in an educational curriculum are not employees, and "it could not reasonably be suggested" otherwise. *Id.*, 330 U.S. at 152-53. *See also Atkins v. General Motors* Corp., 701 F. 2d 1124 (5th Cir. 1983) (students in state vocational school classes at an auto plant were not employees); *Lane v. Carolina Beauty Systems, Inc.*, 1992 LEXIS 15338 (M.D.N.C. July 2, 1992) (student at fully accredited private vocational school was not an employee).

Even the Secretary's investigator testified that the FLSA child labor regulations do not apply to what he termed a "true vocational program as you see in the . . . public schools." R. 79, Tr. 850:14-18. *See also*, R. 79, Tr. 850:24-851:10 (Regulation 3 not applicable to activities that are part of the curriculum of a "true vocational school"); R. 79, Tr. 852:24-853:7 (no violation in minor students' use of table saws in public school because "it is

18

part of a true vocational program"); R. 79, Tr. 853:15-24 (no violation in minor students' "manufacturing" in public school because it "meet[s] all the requirements . . . for being a school" and is "recognized as . . . having a vocational program"). The question, then, is whether Laurelbrook is a "true" vocational school.

The District Court's answer – that Laurelbrook "is a school with a legitimate vocational educational program," R. 84, Memorandum, Conclusions of Law, ¶ 13, 2009 U.S. Dist. LEXIS 60413 at *3 – is clear from the evidence.  Laurelbrook presented extensive testimony about its expenditure of time and resources to develop a structured curriculum and to become accredited. R. 80, Tr. 933:13-934:15; R. 78, Tr. 531:2-11. *See generally*, R. 77, Proposed Findings of Fact by Laurelbrook Sanitarium and School, Inc. ("Laurelbrook PFOF"), App. at 298, ¶¶ 264-272. The person in charge of Tennessee's CTE Division testified that Laurelbrook has a "valid vocational program." R. 80, Tr. at 1052:7-10.  The CTE Division has reviewed the EASEA curriculum that Laurelbrook follows and has granted transfer credits for most of its vocational classes. DX 37, App. at 173. Clearly, the TDOE considers Laurelbrook's program a true vocational program.  The District Court's findings of fact on this issue, R. 84,

Memorandum, Findings of Fact ¶¶ 10-24, 30-37, 46-47, 50, 54-55; 2009 U.S. Dist. LEXIS 60413 at *3-5, are not clearly erroneous.

The Secretary has provided no basis for this Court to second-guess the evaluation of the TDOE or the findings of the District Court.  The Secretary presented no evidence of expertise or institutional knowledge in education and presented no testimony from any witness, let alone an educational or vocational expert, contrary to the TDOE's conclusion.   The Secretary presented no evidence that the Tennessee agency has been corrupt or incompetent in its determination.   Tellingly, the Secretary has never identified what else Laurelbrook could do to convince her that it has a "true" vocational program.

In short, the Secretary has provided no reason that this Court should ignore the determination of the state agency specifically charged with evaluating vocational programs.  The Secretary has undoubted expertise in workplace conditions.  It is the TDOE, however, that is best suited to judge vocational curricula.   It is simply not appropriate for the Secretary to interfere with or to second-guess that agency's evaluation of a vocational program.  *See Bobilin v. Bd. of Ed., State of Hawaii*, 403 F.Supp. 1095, 1108-09 (D. Haw. 1975) (three judge court) ("in our system, the determination of the educational value of the course of activity and study

[the students] are pursuing resides with the Department of Education";
federal court "should not interfere with the workings of what has been
traditionally a matter of local concern and competence -- the education of
the State's young people. . . . It is not the Court's function, in this instance of
statutory construction, to determine what education is to be for students of
the State's public schools . . . . ").

The Secretary relies on *Reich v. Shiloh True Light Church of Christ*,
895 F.Supp. 799 (W.D.N.C. 1995), but that "vocational program" clearly
was a sham.  The children involved did not work at a school or under the
auspices of a school, but instead worked for a privately owned for-profit
business (a large masonry contractor with several hundred employees).
When the Secretary opened an investigation, the church and the masonry
contractor agreed that the church ostensibly would create a vocational
program and the masonry contractor would purchase labor from the
program.  In an earlier case involving the same program, the district court
had no trouble discerning that the masonry contractor was merely
"attempt[ing] to hide behind the label" of a vocational program and that the
vocational program was "a paper sham."  *McLaughlin v. McGee Bros. Co.,
Inc.*, 681 F.Supp. 1117, 1130 (W.D.N.C. 1988).

In stark contrast to Laurelbrook's state-approved program, the Shiloh True Light Church "program" had no curriculum, no accreditation, no vocational certificates, and no other hallmarks of a bona fide vocational curriculum. The district court scathingly criticized the Shiloh program as a "mischievous scheme," concluding, "The shenanigans Defendants have engaged in throughout this action with the help of their attorneys is a shameless effort to continue their exploitation of children in a commercial enterprise." *Shiloh*, 895 F.Supp. at 816, quoting *McGee Bros.*, 681 F.Supp. at 1132.

There can be no reasonable contention that Laurelbrook's vocational school is a sham or a mischievous scheme.[3] Laurelbrook has followed all of the requirements for having its curriculum evaluated and approved by the state agency charged with that task. The Secretary did not prove, or even allege, that that state agency is not competent to evaluate a vocational curriculum. Instead, the Secretary simply treats Laurelbrook as if that accreditation never happened.

In treating Laurelbrook as if it were an ordinary commercial enterprise, the Secretary ignores the fact that Laurelbrook's very reason for

---

[3]    Even in the egregious *Shiloh* case, the court denied the Secretary's motion for summary judgment because there was a genuine issue of material fact whether the children or the defendants primarily benefited from the children's labor. 895 F.Supp. at 818.

being is to integrate into its students' education a significant component of hands-on work.  As the District Court found:

> Defendant is a religious based organization and follows the tenets and teachings of the Seventh-day Adventist Church. Central to these beliefs and teachings are the works of Ellen G. White, the founder of the Seventh-day Adventist Church.  Part of Ms. White's teachings included the necessity of children receiving an education that includes practical training. Defendant operates in accordance with this goal of fulfilling Seventh-day Adventist beliefs.  For that purpose Defendant operates a bona fide high school, boarding school for grades 9 through 12, elementary school for children of staff members, and Sanitarium as facets of its overall education program.

R. 84, Memorandum, Findings of Fact ¶¶ 6-10; 2009 U.S. Dist. LEXIS 60413 at *3.

Any evaluation of Laurelbrook's program must include its religious beliefs.  The TDOE was able to include those beliefs in its evaluation, as was the District Court, and both found that Laurelbrook's program follows a valid educational curriculum.  The Secretary errs in limiting her perspective so as to ignore both the broad educational purpose of Laurelbrook School and the expressed educational objectives of the school's vocational program – an error the Secretary has committed before.  *See Marshall v. Regis Educ'l Corp.*, 666 F.2d 1324, 1327 (10th Cir. 1981) (Secretary erroneously deemed student resident-hall assistants at a private college to be employees; "We believe the Government's perspective to be so limited as to ignore not only

the broad educational purpose of this private liberal arts college, but also the expressed educational objectives of the student resident assistant program").

Other courts have refused to make the mistake the Secretary makes here, and have held that vocational school students are not employees. *See, e.g., Atkins*, 701 F. 2d 1124 (state vocational school classes for prospective workers at auto plant); *Lane*, 1992 LEXIS 15338 (student at accredited private vocational school).

Even in cases involving non-vocational schools, the courts have held that students whose schools require them to perform work as part of their education are not employees. *See, e.g., Blair v. Wills*, 420 F.3d 823, 829 (8th Cir. 2005) (in conjunction with school's curriculum, students were required to perform various chores, including laundry, cleaning, lawn-mowing, brush-clearing, painting, general maintenance, and other tasks, all to instill in students a sense of teamwork, responsibility, accomplishment, and pride; students' activities were not "work" and the school was not an "employer"); *Regis Educ'l Corp.*, 666 F.2d at 1327 (student resident hall assistants were not employees when the resident assistant program was "considered within the full educational context"); *Bobilin*, 403 F.Supp. at 1108 (state board of education rules requiring students in grades 4-12 to work in the school cafeteria for up to seven full days in one school year served educational

purposes – "not only neatness and responsibility but also civic attitudes fundamental in a collective society where a citizen is often called upon to 'do his share' without economic compensation"; "Hence, the nature of the service performed by plaintiffs is not 'employment' within the meaning of the FLSA").

For all of these reasons, students in Laurelbrook's bona fide vocational program are not, as a matter of law, employees under the FLSA.

### B.    There Is No Precedent for the Secretary's Attempt to Apply FLSA to Students at an Accredited Vocational School.

Significantly, the Secretary has never previously attempted to apply the FLSA to an accredited vocational program, public or private. Undersigned counsel have not found any reported case in which the Secretary has sued an accredited vocational school, and the Secretary has not cited any such case at any stage in this litigation, including in this appeal.[4]

The absence of any previous cases is inexplicable given the Secretary's analysis in this case, which also would apply to every other public and private vocational school in Tennessee and in the nation. The obvious explanation is that, at least until now, the Secretary has recognized that students in bona fide vocational schools are outside the scope of the

---

[4]    The plaintiffs in *Atkins* and *Lane* were individual students; the Secretary was not a party in either case.

FLSA, consistent with *Portland Terminal*. The Secretary presented no evidence at trial to justify its decision to treat Laurelbrook differently than every other accredited and approved vocational program in this Circuit.

## II.    The District Court Used the Proper Analysis for Determining that Laurelbrook's Students Are Not Employees.

### A.    The Secretary's Test Is Entitled to No Deference from this Court.

The Secretary claims that *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944), requires this Court to give deference to her interpretation of 29 U.S.C. § 203(e)(1). As this Circuit has noted, however, deference depends, in part, upon the opinion's "consistency with earlier and later pronouncements," *OfficeMax, Inc. v. United States*, 428 F.3d 583, 595 (6th Cir. 2005), and its foundation in the agency's expertise. *Air Brake Systems, Inc. v. Mineta*, 357 F.3d 632 (6th Cir. 2004). Other courts have noted that deference is not required for matters within a court's core competence. In this case, the Secretary's interpretation meets none of the criteria for deference.

The Secretary has not been consistent in insisting that a training program meet all six of her criteria. *See* Op. Wage-Hour Admin'r No. 1849, 1995-99 Wages Hours (CCH) 32,671 (May 1, 1996) (listing eight criteria for a workplace training program; even if some of the criteria were not met, "it

is still possible that a trainee would not be an employee under the FLSA; however, all of the facts and circumstances would have to be considered"); Op. Wage-Hour Admin'r No. 638, 1966-69 Wages Hours (CCH) 30,628 (July 18, 1967) ("there is no single rule or test for determining whether an individual is an employee, but . . . the total situation controls"); Op. Wage-Hour Admin'r No. 249, 1961-66 Wages Hours (CCH) 30,843 (April 11, 1964) (listing only five criteria that a facility must meet). Even one of the Opinions that the Secretary claims for support states, "If, in fact, the summer job training program is *predominantly* for the benefit of the youth participants, we would not assert an employment relationship." Op. Wage-Hour Admin'r No. 2334, 2002-04 Wages Hours (CCH) 31,071 (September 5, 2002) (emphasis in original).

In one situation involving school students, the Secretary did not even mention her six-part test. *See* Op. Wage-Hour Admin'r No. 650, 1966-69 Wages Hours (CCH) p. 30, 641 (September 13, 1967) (law school students working on law review "are participants in activities generally recognized as extracurricular and conducted primarily for their own benefit"; law school's indigent services program "is part of the educational opportunities provided to those students selected to participate in it. Where such training is so

[predominantly] [sic] for the benefit of the law students, we would not assert that they are employees of the law school.").

This lack of consistency is fatal to the Secretary's claim of *Skidmore* deference.  *See Rosales-Garcia v. Holland*, 322 F.3d 386, 403 n. 22 (6th Cir. 2003) (government's position in immigration issue "has been inconsistent and is therefore unpersuasive"); *Reich v. Parker Fire Protection Dist.*, 992 F.2d 1023, 1026 (10th Cir. 1993) (noting inconsistencies in application of six-part test).  The Secretary's interpretation, therefore, must stand or fall based on the soundness of its reasons, not just because the Secretary says so. "Agencies in the end receive *Skidmore* respect because of the persuasiveness of their reasoning, not in spite of it."  *OfficeMax, Inc.*, 428 F.3d at 595.

A second reason that the Secretary's interpretation is not entitled to deference is that she is evaluating a program in which she has no particular expertise.  The basis of *Skidmore* deference is that the regulating agency has expertise in a given subject matter.  *Air Brake Systems, Inc*, 357 F.3d at 643 ("*Skidmore* permits courts to give consideration to an agency's expertise and ability to persuade").  In this case, it is clear that the Secretary has no particular expertise in evaluating education programs.

A final reason for not granting deference is that the Secretary is interpreting, not a statute, but a U.S. Supreme Court opinion.  *Cf., Kilgore v.*

*Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 303 (6th Cir. 1998) (no *Skidmore* deference where agency did not cite statutory source for rule). The Secretary has no expertise in judicial interpretation.  This Court has that expertise, and thus no need to defer to the Secretary.  As a sister circuit noted in rejecting an agency's exercise of jurisdiction over a religious school, "We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle.  There is therefore no reason for courts — the supposed experts in analyzing judicial decisions — to defer to agency interpretations of the Court's opinions." *University of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002).

Here, the Secretary has concocted her test from Supreme Court precedent. *See, e.g.*, Op. No. 2334 *supra* (September 5, 2002) ("the Supreme Court has held").  This Court is better suited to construe judicial precedent than a regulatory agency, and certainly is much better qualified to determine how to apply Supreme Court precedent.  The question for this Court, then, is not what the Secretary says, but what is the best test to apply.

**B.    The Best Analysis Focuses on the Primary Benefit of the Program.**

The test the District Court used is the best one to apply, for several reasons.  Not only is it grounded in the law of this Circuit, but also it allows

courts to consider a variety of factors that the Secretary's rigid test would exclude.   Focusing on who receives the most benefit from a particular program allows courts flexibility to consider all aspects of the training, not just those that the Secretary has distilled from her Department's narrow experience in reviewing employer-sponsored programs.

Any analysis of the correct standard must begin with *Walling v. Nashville, C & St. L. R. Co.*, 155 F.2d 1016 (6th Cir. 1946), *aff'd*, 330 U.S. 158 (1947) (hereinafter "*Nashville*").   In *Nashville*, this Circuit considered and rejected the claim that trainees were employees of a railroad.   The court relied heavily on *Walling v. Jacksonville Terminal Co.*, 148 F.2d 768 (5th Cir. 1945), specifically citing the portion of the opinion that held that the trainees were acting for their own benefit.   *Nashville*, 155 F.2d at 1018, *citing*, *Jacksonville Terminal Co.*, 148 F.2d at 770.

The Secretary discounts this Circuit's holding, claiming that it was superseded by the six-part test supposedly set out in *Portland Terminal*.  The first flaw in the Secretary's claim is that *Portland Terminal* did not set out such a test.   It cited some of the facts present in that case, but gave no indication of requiring those factors in other cases.  *Portland Terminal*, 330 U.S. at 149-150.   The Court clearly did not intend to establish those factors as a rigid test, but simply noted them in reaching its central conclusion that

the FLSA "cannot be interpreted so as to make a person whose work serves only his own interest an employee of another person who gives him aid and instruction." *Id.* at 152.

The second flaw in the Secretary's argument is that the Supreme Court's affirmance of this Circuit's ruling in *Nashville* precludes her interpretation. The Supreme Court held in *Nashville* that the "findings of fact here as to the training of these trainees are in all relevant aspects practically identical" with those in *Portland Terminal*. 330 U.S. at 160. This Circuit's findings of fact in *Nashville*, however, do not include any statements that the students received training equivalent to a vocational school, received close supervision, sometimes impeded the employer's operations, or had an understanding that they would not receive wages. *Nashville*, 155 F.2d at 1018. The only similarity between the factual findings in *Portland Terminal* and *Nashville* is that students "are present on the job solely for their own benefit and advantage, in order to qualify themselves for future employment." *Nashville,* 155 F.2d at 1018. That finding, then, is the central test that the Supreme Court instituted.

The foregoing interpretation finds support in subsequent case law, both in this Circuit and in the U.S. Supreme Court. In *Western Union Tel. Co. v. McComb*, 165 F.2d 65 (6th Cir. 1947), this Circuit described the

31

central holdings of both *Nashville* and *Portland Terminal.* The court reasoned that the Circuit's opinion in *Nashville* "held merely that where a railroad company, without exercising authority or control over their activities, permitted trainees to use its facilities during their training period, the trainees were not working for the benefit of the company and were not its employees." *Id*. at 70. *Portland Terminal*, on the other hand, "held that trainees for work as yard brakeman, whose work did not expedite the railroad's business but sometimes actually impeded and retarded it, were not employees." *Id.* at 70-71.

In the first case after *Portland Terminal* in which it considered the definition of "employee," the U.S. Supreme Court characterized *Portland Terminal* as excluding "those 'who, without any express or implied compensation agreement, might work for their own advantage on the premises of another.'" *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728-29 (1947). *See also*, *Tennessee Coal, Iron & Railroad Co. v. Muscoda Local No. 123*, 321 U.S. 590, 598 (1944) (employment means exertion "pursued necessarily and primarily for the benefit of the employer and his business").

This Circuit's latest analysis of the trainee question reinforces the foregoing analysis of *Portland Terminal.* In *Marshall v. Baptist Hospital,*

*Inc.*, 668 F.2d 234 (6th Cir. 1981), this Circuit approved the test that the district court had applied.   *Id.* at 236.   Contrary to the Secretary's representations, the trial court did not apply the six-factor test.  The trial court did analyze some of those factors, but it specifically adopted the "economic reality test."  *Baptist Hosp. Inc.*, 473 F.Supp.  465, 467-68 (M.D. Tenn. 1979), *rev'd on other grounds*, 668 F.2d 234 (6th Cir. 1981).  That test, derived from other FLSA cases, "requires a court to examine the 'circumstances of the whole activity'" rather than 'isolated factors.'" 473 F.Supp. at 467-68.  *See, e.g., Tony & Susan Alamo Fnd'n v. Sec'y of Labor*, 471 U.S. 290 (1985) (applying economic reality test to question of whether persons were employees or volunteers); *Lilley v. BTM Corp.*, 958 F.2d 746 (6th Cir. 1992) (ADEA claims); *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962 (6th Cir. 1991) (statutory employer); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139 (6th Cir. 1977) (anti-discrimination provisions of FLSA).

The District Court's interpretation of *Portland Terminal* as establishing a "primary benefit" analysis also finds more support in the case law of other circuits than does the Secretary's rigid test.  Only the Fifth Circuit has followed the six-factor test.  *Atkins*, 701 F.2d 1124.  Most circuits have rejected it as too rigid.  *See McLaughlin v. Ensley*, 877 F.2d 1207, 1209 (4th Cir. 1989) ("the general test used to determine if an

employee is entitled to the protections of the Act is whether the employee or employer is the primary beneficiary of the trainees' labor"); *Blair*, 420 F.3d at 829 (citing both economic reality and primary benefit analyses, but not six-factor test); *Williams v. Strickland*, 87 F.2d 1064, 1066 (9th Cir. 1996) (combining *Portland Terminal* and *Alamo* standards to find clients of rehabilitation program were not employees; *Portland Terminal* "articulated two limits to FLSA coverage -- first, no coverage for persons "who, without any express or implied compensation agreement, might work for their own advantage on the premises of another;" second, the case excepted persons "whose work serves only [their] own interest")*; Parker Fire Protection Dist.*, 992 F.2d at 1027 (rejecting the six-factor test as unduly rigid; "We find it informative that determinations of employee status under FLSA in other contexts are not subject to rigid tests but rather to consideration of a number of criteria in their totality."). *See also*, *Regis Educ'l Corp.*, 666 F.2d 1324 (applying economic reality test, college resident assistants not covered by FLSA).

The primary benefit test not only is better grounded in precedent than the Secretary's test, but it also is more adaptable to non-workplace settings. The Secretary's test, rooted as it is in traditional workplace structures, does not provide an adequate framework for analyzing the goals of other

institutions.  For example, the six-part test has no room for weighing the benefits of character development.  That task is not an aim of traditional employers, but it is an integral part of most educational institutions.  *See, e.g.*, *Blair*, 420 F.3d at 829 ("chores were an integral part of the educational curriculum" and "were intended to instill in each student a sense of teamwork, responsibility, accomplishment, and pride"); *Regis Educ'l Corp.*, 666 F.2d at 1327 ("We believe the Government's perspective to be so limited as to ignore not only the broad educational purpose of this private liberal arts college, but also the expressed educational objectives of the student resident assistant program").  By focusing only on the economics of a given situation, the Secretary loses any ability to accurately evaluate the total benefits of an educational curriculum.

Similarly, the Secretary's test has no room for evaluating the religious mission of an institution such as Laurelbrook.  Contrary to the Secretary's claims, Laurelbrook has never sought a complete exemption from oversight. It simply has asked that its religious character be considered as an important factor in its educational program.  The TDOE was able to account for those religious beliefs in its accreditation decision, and the District Court was able to include them in its analysis.  The Secretary, by rote application of her test,

would have this Court ignore Laurelbrook's core mission and the single most important reason that parents choose that school for their children.

The final failing of the Secretary's test also may be one reason that the Secretary is fond of it: namely, the unfair advantage that it gives her Department. While a subject of a Secretary's investigation must produce evidence of all six factors, the Secretary needs to select only one factor, of her own choosing, on which to concentrate resources. Relieved of the obligation to balance any facts or consider the totality of the circumstances, the Secretary may designate the facts that she deems important and ignore the rest. In this case, Secretary did exactly that. Her investigator concluded that Laurelbook failed to meet the second and fourth criteria, R. 79, Tr. 812:8-15, 19-25, although he did no investigation to confirm his conclusions. R. 79, Tr. at 812:8-15, 822:22-823:17, 824:1-826:3. In fact, he conducted absolutely no investigation into any of the six factors. R. 79, Tr. 819:21-820:24, 821:12-822:1, 822:19-823:25, 824:1-826:3, 826:9-827:25, 832:9-833:18, 834:14-835:12.

Viewing all of the relevant facts and balancing them is the best approach to this question. It is the analysis best grounded in precedent, and it also allows a court to view all applicable facts, consider the differing purposes of different institutions, consider core values, and evenly distribute

the burden of producing evidence.  The District Court used the correct standard, and, as a matter of law, accurately judged all of the relevant facts.

## C.    The Primary Beneficiaries of Laurelbrook's Program Are Laurelbrook's Students.

The District Court properly balanced all of the evidence presented at trial, and properly found that the primary benefit of the Laurelbrook program flows to its students.  It is true that Laurelbrook receives some incidental benefit from the students' activities, just as vocational students supplement the budgets of neighboring schools.  R. 80, Tr. 1006:15-1007:6, 1007:16-1008:24; 1011:2-14; R. 80, Tr. 1058:19-1060:24.  The primary beneficiaries, however, are the students, who learn "practical skills about work, responsibility, and the dignity of manual labor in a way consistent with the religious mission of their school." R. 84, Memorandum, Conclusions of Law ¶ 13; 2009 U.S. Dist. LEXIS 60413 at *18.

The Secretary does not address the primary benefit test, but does present an argument in connection with the second and fourth factors of her six-factor test. The Secretary, true to form, focuses narrowly on only one aspect of Laurelbrook's program, the Sanitarium.  She completely ignores the educational, spiritual, and character value of the Laurelbrook program as a whole.

The Secretary continues to treat the students' work at the Sanitarium as a profit center for Laurelbrook, despite clear testimony to the contrary. Laurelbrook presented uncontradicted evidence that the amount of money that it receives from Medicaid is capped at a set maximum.  R. 81, Tr. 1251:16-1253:24; DX 9, App. at 171.  When Laurelbrook removed the student CNA hours from the calculations in its cost report, its costs were still over the cap.  R. 81, Tr. 1253:25-1254:6.  Including the students in its cost reports, therefore, netted Laurelbrook no additional Medicaid funds.  R. 81, Tr. 1254:7-10.  The Secretary never contested these findings; indeed, she never even investigated them.  R. 79, Tr. 826:24-827:3, 832:9-833:18.

Certainly, Laurelbrook receives some incidental benefit from its students' vocational activities. Similarly, the local high school benefits when its students sell produce from the school greenhouses or repair cars for the public.  R. 80, Tr. 1006:15-1007:6, 1008:8-24. However, such *de minimis* benefits do not warrant a conclusion that the students are employees.  *See Parker Fire Protection Dist.*, 992 F.2d at 1028; *Atkins*, 701 F.2d at 1129.

Against any incidental benefit to a school, this Court must weigh the benefits the students receive.  In addition to fully recognized vocational credits (*supra*, pp. 1-3), Laurelbrook students receive invaluable practical training.  The TDOE encourages vocational schools to provide hands-on

training to their students, believing that such training is important to learning skills.  It also gives them a sense of accomplishment that they do not get from the classroom setting alone. R. 78, Tr. 543:18-544:18, R. 80, Tr. 1022:21-1023:23.  In fact, Tennessee CTE standards require a certain level of hands-on training for course credit.  *Supra*, pp. 12-14; R. 77, Laurelbrook PFOF, App. at 283, ¶ 157.

Like other vocational schools, Laurelbrook looks for opportunities for its students to assist the community.  The agriculture program provides food to the Women's Care Center and to soup kitchens in Dayton. R. 78, Tr. 533:7-13.  When an area family lost its home to fire, Laurelbrook students put a new roof on the replacement home.  R. 78, Tr. 533:14-19.  Laurelbrook students have assisted local farmers in bringing in their crops and yard maintenance. R. 78, Tr. 533:20-534:3.  On twice-yearly mission trips, the students help build structures for overseas missions, such as a medical clinic for an orphanage in Haiti.  R. 82, Tr. 132:13-19.  On those trips, the students use the skills they learn in the vocational program at Laurelbrook.  R. 82, Tr. 132:20-22.  Even the much-maligned boiler duty provided students with skills that they were able to use in developing countries.  R. 82, Tr. 150:22-151:14.

For the most part, however, Laurelbrook is limited to on-campus practical training. It is logical, then, for it to use the resources available to it, such as a commercial kitchen and nursing home, to teach students how to work in such settings. *Cf.*, DX 38-Q, App. at 177; R. 80, Tr. 1084:9-1085:21. Gary Cooper, the vocational director at the local public high school, testified that his students would benefit if there were a medical facility where students in health sciences classes could gain hands-on experience. R. 80, Tr. 1005:14-19. The housekeeping tasks that the Secretary finds so offensive teach students housekeeping standards for health care settings, R. 81, Tr. 1240:9-23, and how to prevent the spread of communicable diseases. R. 81, Tr. 1240:24:1241:3.

Another benefit to Laurelbrook students is the ability to receive training consistent with their and their parents' religious beliefs. R. 84, Memorandum, Findings of Fact at ¶¶ 48-49; 2009 U.S. Dist. LEXIS 60413 at *8. The Secretary refuses to consider this benefit, and attacks the District Court's finding of fact on this issue with citations to inapplicable holdings in the *Shenandoah Baptist Church* and *Shiloh* cases, *Brock v. Wendell's Woodwork, Inc.*, 867 F.2d 196 (4th Cir. 1989), and *Tony & Susan Alamo Fndn.*, 471 U.S. 290 (1985). The *Shenandoah Baptist Church*, *Shiloh*, and *Wendell's Woodwork* cases are inapplicable for the reasons stated at pp. 62-

63 and 21-22, *infra* and *supra*, respectively.  (The *Wendell's Woodwork* case
is another branch of the *Shiloh* case.)

The *Alamo Fndn.* case did not involve a vocational school or the child
labor provisions of the FLSA, and the quotation from the case used by the
Secretary, Appellant's Brief at 52, had nothing to do with the relative
benefits of the work in question to the Foundation or its "associates."
Instead, the passage dealt with whether the Foundation was an "enterprise" –
"a factual question" that, in stark distinction from this case, had been
"resolved against [the Foundation] by both courts below."  471 U.S. at 298-
99.

A final important benefit of the practical training at Laurelbrook is the
character education that it provides for students.  Numerous parents testified
to the benefits that their children received from the Laurelbrook program.  R.
79, Tr. 734:20-22 (Brenda Herra's children "learned the importance of
working and being on time and accomplishing the task to the best of your
ability"), R. 79, Tr. 764:24-766:23 (Dorka Ubiera's daughter has become
more responsible, learned leadership skills, and been able to learn skills
toward her goal of being an architect).  Service in the nursing home teaches
students to have more sensitivity and respect for the elderly and infirm.  R.
79, Tr. 763:8-18.  Gary Cooper agreed that, if he could give his public

school students hands-on experience in a nursing home, that opportunity would provide invaluable character education for those students.  R. 80, Tr. 1018:13-1019:20.

Laurelbrook's structure of having instructors work alongside students has benefits both in teaching students skills and in training their character. Sharon Oxentenko, a graduate of Laurelbrook, testified that working alongside one particular staff member in the Sanitarium as well as being in her English class improved her work in that academic class because "I wanted to match up to her standards, I wanted to do the best I could do . . . I wanted her to think highly of me, that I did a good job wherever I was."  R. 72, Tr. 1125:6-13.

Ronald Oxentenko testified, "You're sitting there in a one-on-one or two-on-one environment, with somebody who is interested in teaching you, besides just getting the job done."  R. 72, Tr. 1164:17-19.  Rev. Daniel Graham described the Laurelbrook program as "apprenticeship learning through modeling."  The staff members "modeled what it was to be a servant leader."  R. 72, Tr. 1133:6-9.

Various Laurelbrook alumni testified about the many benefits they had received from the vocational training at Laurelbrook. Jeremy Shull, who owns a roofing business in Denver, Colorado, learned leadership skills from

supervising other students. R. 72, Tr. 1090:10-1091:3, 1092:9-17.   As an employer, Mr. Shull has found that Laurelbrook graduates have a strong work ethic, leadership skills, and work skills that graduates of other vocational programs do not have, R. 72, Tr. 1092:23-1093:20, as well as a broader skill set. R. 72, Tr. 1093:21-1094:7.

Sharon Oxentenko testified that, at Laurelbrook, "I learned how to do anything in a school kitchen."   R. 72, Tr. 1122:6-13. She could not have learned those skills as well in another environment because "they would just focus you on one area, once you got that, you would be left.  At Laurelbrook they wanted us to learn every single area where we went."   R. 72, Tr. 1124:8-10.

Daniel Graham, a minister in Florida, testified that the program at Laurelbrook enabled him to work his way through theology school, both undergraduate and graduate studies.  R. 72, Tr. 1128:22, 1131:3-13.  He learned skills at Laurelbrook about working with people and "working in a team" that have helped him in his ministry as a pastor.  R. 72, Tr. 1131:21-25. Rev. Graham currently is working on his doctorate in leadership and church administration and has found that all of the basic leadership skills that he learned at Laurelbrook are "the things that are the cutting edge of today's leadership."  R. 72, Tr. 1134:18-1135:2.

Ronald Oxentenko owns a construction company and has worked in construction for a number of years.  R. 72, Tr. 1155:5-8, 16-19.  He believes that the primary thing that he learned at Laurelbrook is "how do you do a job, and do it all the way to the end, do it well, and do it so that it's, you know, accomplished in a right manner."  R. 72, Tr. 1157:3-8.  He also testified, "But the main thing that I would say that I gained from Laurelbrook that has helped me more in life than any other thing is just an ethic, you know, a work ethic that tells you – that sustains you, whenever life is not fun anymore and it's boring, to get your job done, but know how to get it through and finish it all the way where it's a good job."  R. 72, Tr. 1157:13-18.

The Secretary has no place for these benefits in her analysis, even though character training and religious beliefs are at the core of Laurelbrook's purpose.  The District Court rightly found that those factors are supremely important, and that those benefits to Laurelbrook's students outweigh any small monetary benefit that Laurelbrook might receive.

### III.    Even Under the Secretary's Six-Factor Test, the FLSA Does Not Apply to Laurelbrook's Students.

Even if this Court applies the Secretary's six-factor test, Laurelbrook students are trainees.  As an initial matter, the Secretary had the burden of

proof at trial of producing evidence to support her claim of jurisdiction. *Reich v. ConAgra, Inc.*, 987 F.2d 1357, 1360 (8th Cir. 1993). To the extent, then, that the record lacks evidence on a given issue, such failure is charged against the Secretary.

### A. Laurelbrook Is a Valid Career and Technical Education Program, Fully Recognized by the State of Tennessee.

Laurelbrook's program not only is similar to that provided in a vocational school, it *is* a vocational school. According to Will Lewis, the Director of Curriculum and Instruction for the CTE Division, R. 80, Tr. p. 1043:14-17, Laurelbrook's program is a valid CTE program. R. 80, Tr. at 1052:7-10. In fact, it was at his suggestion that Laurelbrook and EASA submitted the vocational curriculum for transfer credits. R. 80, Tr. 1046:11-18; 1048:13-25.

The Secretary's response to this fact is a long disquisition on claimed flaws in Laurelbrook's educational program, even using Laurelbrook's efforts at self-improvement against it. Nowhere, however, does the Secretary identify her authority to overrule the determination of the TDOE, or its expertise in determining the educational value of a program. Instead, she simply cites her own authority about education programs. For example, she asserts that training programs must be career-oriented, Appellant's Brief at pp. 38-29, but cites only a Department Opinion Letter considering

whether students placed in off-campus internships become employees of those businesses.  Op. Wage-Hour Admin'r No. ___,[5] 1975 Westlaw 40999 (October 7, 1975).  Similarly, the Secretary argues that state vocational education requires progressive learning, but cites only a Department Opinion Letter addressing an employer-sponsored six-week training program. Appellant's Brief at 41-42, *citing*, Op. No. 1849, (May 1, 1996).  Nowhere does she cite any education or vocation authorities for her claims.

Indeed, the Secretary's criticism of Laurelbrook's program reveals her lack of expertise in evaluating educational programs.  She argues that repetitive work has no educational value, a claim that would dispense with most homework in secondary schools.  While students no doubt would welcome such a rule, educators are unanimous that repetition, even of menial tasks, is a basic requirement of thorough learning. The Secretary's argument also ignores the value of the character education that Laurelbrook provides its students.  *See, supra*, pp. 41-44.  If the Secretary insists on ignoring such core principles of secondary education, of course she will not recognize the value of such programs.

---

[5]     Laurelbrook has been unable to locate this particular letter in any published database other than Westlaw, which does not provide the number of the Opinion Letter.

The Secretary also either misunderstands or misconstrues the record below.  Laurelbrook students do learn new skills with each rotation.  Even though they are returning to the same location, just as students in the nearby public high school return to the same classroom, they take on more responsibilities with each rotation. R. 82, Tr. 137:16-138:11, R. 79, Tr. 739:20-24, R. 81, Tr. 1246:7-1247:4.  Laurelbrook proactively measures which tasks students are mastering, to ensure that they are not repeating the same tasks if they rotate back in later years.  R. 81, Tr. 1245:13-21.

The Secretary's claims that students are not supervised and are placed "as needed" are based solely on the testimony of two former students and a single work schedule for several freshman students.  Appellant's Brief at 42-43.  The credibility problems of Joseph and Bradley Bear are outlined above. *Supra*, pp. 8-9.

The Secretary's argument about the work schedule ignores testimony that Laurelbrook deliberately places its freshman in a variety of placements, R.78, Tr. 547:23-548:5, as does the local public high school.  R. 80, Tr. 1028:12-21, 1029:12-19.  Laurelbrook follows this pattern because the overview helps freshman adjust to the program, R. 78, Tr. 548:5-16, and gives them time to develop a longer attention span and stronger work ethic.

R. 81, Tr. 1244:20-1245:13. The Secretary's claims, therefore, are not credible, and the District Court did not clearly err in disregarding them.

The Secretary's argument that Tennessee student-learning training requirements track FLSA regulations shows that the Secretary does not even understand how her own regulations apply to a school. The Tennessee program involves experience that students gain "*at the work-site.*" PX 83 at 1, App. at 115. It involves activities off the school campus, outside the classroom, R. 80, Tr. 995:13-14 (Cynthia Benefield, TDOE), Tr. 1003:19-1004:3 (Gary Cooper, Director of Vocational Education, Rhea County High School); Tr. 1076:19-1077:10 (Will Lewis, TDOE, Director of CTE Division). It has no application whatsoever to learning in a school setting. Indeed, the work-based learning regulations cannot apply to a school such as Laurelbrook, given that the federal regulations require an agreement between the school and the off-campus workplace. 29 C.F.R. § 570.55(c)(2). The regulations do not provide any guidance for judging a *school-based* curriculum. The experts in the TDOE understood the difference, which is why they applied the evaluation standards for a school CTE curriculum to Laurelbrook's program. R. 80, Tr. 1046:11-1047:1. The Secretary's argument, based in her ignorance of how an education curriculum works, is a complete *non sequitir*.

48

The Secretary's final argument is equally fanciful.  She believes that, because the TDOE accredited Laurelbrook through an accrediting agency, the school somehow is not genuinely accredited.    Tennessee has approximately 700 non-public schools, R. 80, Tr. 961:24, only 174 of which the state accredits directly, R. 80, Tr. 964:20-965:1.  The remainder the state either cannot accredit because of state statute, R. 80, Tr. 963:4-6, or accredits through accrediting agencies, R. 80, Tr. 962:1-9, 20-22.  According to the Secretary's logic, then, approximately 500 Tennessee schools are not genuinely accredited and therefore are subject to her Department's oversight of their educational curriculum.  The Secretary offers no basis for so cavalierly disregarding the decision of a state education agency, or why any federal department would be acting within its lawful authority to do so.

There can be little doubt that Laurelbrook's program teaches transferable skills.  "A training program that emphasized the prospective employer's particular policies is nonetheless comparable to vocational school if the program teaches skills that are fungible within the industry." *Parker Fire Protection Dist.*, 992 F.2d at 1028.  *See, e.g., Carter v. Mayor & City Council of Baltimore City*, 2010 U.S. Dist. LEXIS 18477 at *16 (D. Md. Mar. 2, 2010) ("Plaintiffs obtained a license fully transferrable [sic] to

their employment with any other employer that required the ability to provide Advanced Life Support"); Lane, 1992 WL 228868 at *8 ("The skills Plaintiff acquired are not unique to the services offered by CBS. . . . In other words, the benefit she received from being in the teacher training program is fully transferable").

The Secretary's argument on this point exemplifies the core problem with the Secretary's entire approach to Laurelbrook. The Secretary simply refuses to view Laurelbrook as anything other than a workplace. The school follows the procedures set up by the state education authority; the Secretary second-guesses those procedures. The state education authority approves Laurelbrook's vocational program; the Secretary disregards that approval. Laurelbrook's vocational curriculum teaches the skill sets that the state education authority mandates; the Secretary applies her own policies that were designed to judge workplace training. Laurelbrook endeavors to instill in its students good character and religious values; the Secretary applies standards that do not and cannot account for those educational goals. Laurelbrook has done all that its state accrediting agency has required of it; the Secretary has no authority to require more.

### B.    Laurelbrook's Vocational Training Program Is for the Benefit of Its Students.

The second factor in the Secretary's test is whether the program benefits the students rather than the institution. For all of the reasons explained *supra*, pp. 37-44, the District Court's findings were not clearly erroneous, and Laurelbrook's program meets this criterion.

### C.    The Students Do Not Displace Regular Employees at Laurelbrook and Work Under Their Close Supervision.

Laurelbrook provided ample evidence in the trial court that its vocational students do not displace adult staff.  If the vocational program disappeared, numerous staff, relieved of their teaching responsibilities, would be free to work elsewhere.  R. 78, Tr. 552:2-15, 552:16-553:9. While some areas would need just as many adults as students, other areas would require fewer adults because adults generally work more efficiently than students.  *See, e.g.* R. 79, Tr. 736:8-737:12 (Brenda Herra could replace four students with two full-time and one part-time adult staff); R. 81, Tr. 1184:1-20 (Robert ("Mr. Bob") Zollinger, with one co-worker, would lay anywhere from 300 to 700 blocks in a day if he were just attempting to get the job done, but if he were teaching one or more students to lay blocks they "may do good to lay 25 or 50 blocks, something like that."); R. 72, Tr. 1164:2-16 (Ronald Oxentenko testified staff members spent much more time

teaching students how to perform tasks than it would have taken the staff to do the same tasks themselves").

Laurelbrook president Charles Hess and vocational coordinator Fred Douville calculated the staff hours that would be needed to substitute for students, if the vocational program were abandoned, and how many staff hours would be freed from vocational instruction. R. 78, Tr. 552:16-20, R. 80, Tr. 920:19-23, 921:24-923:22. They determined that Laurelbrook would need to replace a total of 68 man hours per day, R. 80, Tr. 923:19-22, and that the school would have ample staff members to fill all jobs. R. 80, Tr. 923:23-927:9; DX 11, App. at 225.

The Secretary has no evidence rebutting these facts, and in fact never even investigated the question.  R. 79, Tr. 824:1-826:3.  She simply cites again to her own authority, claiming that displacement of regular employees equates to operating in competition with other area establishments.  Of course, the Secretary presented not one iota of evidence that Laurelbrook competes with any other establishments.  The Secretary's investigator did not even conduct any investigation into this question. R. 79, Tr. 824:1-826:3.

The Secretary also cites herself for the proposition that a training program cannot cause employees to be laid off, not hired, or work fewer hours.  She then makes the puzzling claim that moving staff around within

an institution actually equates to the "displacement" of workers. Appellant's Brief at 54. This argument simply makes no sense. Reassigning job responsibilities has no relation to cutting back on the number or hours of employees. Laurelbrook's evidence established that teaching its students vocational skills did not cause it to assign staff to fewer hours, avoid hiring staff, or lay off teachers. The program simply resulted in existing staff's being assigned to teaching vocational classes instead of other duties. Such reassignments are not prohibited by any rational authority that the Secretary can cite.

The Secretary also misstates the record in two respects. First, she claims that Keith Wellman, the administrator of the Sanitarium, "recognized that Laurelbrook students eliminated the need to hire more outside people." Appellant's Brief at 54. Mr. Wellman actually testified that he "could always use more help from Laurelbrook *staff* in the nursing home." R. 80, Tr. 913:21-24. He also stated that he never lays off an adult worker at the Sanitarium to make room for a student, because he might not be able to get the adult worker back after the student's rotation is over. R. 83, Tr. 404:23-405:1.

Next, the Secretary claims that a Sanitarium staff member confirmed that there is no distinction between the work performed by student CNAs

and adult CNAs.  Appellant's Brief at 54.  Actually, the exchange went as follows:

> Q.    And the CNAs that are students, they can go and help the
>       — just like any other CNA would do, they would do
>       duties with the residents?
>
> A.    I'm sorry.  I couldn't understand your question.
>
> Q.    The CNAs, the students that have their CNA license,
>       they're allowed to go and work just like any other CNA
>       would do in dealing with the residents?
>
> A.    I guess so.

R. 79, Tr. 771:11-18.  That testimony is hardly a ringing endorsement of the Secretary's position.  Mr. Wellman, by contrast, testified unambiguously that the students who are assigned to the Sanitarium always work with an adult CNA. R. 83, Tr. 402:9-12; R. 79, Tr. 754:23-755:3.

The Secretary simply has no evidence for her claim that Laurelbrook students displace adult workers.  Laurelbrook's vocational program, designed for the benefit of students, provides valuable practical training by having students work side-by-side with adult teachers.  Those teachers, however, could keep things running perfectly well by themselves with no student assistance.

**D.    Laurelbrook Derives No Immediate Advantage From Teaching Its Students, and the Students Usually Impede Its Operations.**

Not only could Laurelbrook staff keep things running without student assistance, but in many instances they could do better without the students there.   As explained *supra*, pp. 51-52, the vocational program requires much more time and attention from adults than it would for them to simply do the job themselves.  The Secretary has no contrary evidence, contenting herself with simply rehashing her earlier conclusions.  All of those, as Laurelbrook explains above, are based on unreliable, misstated, or non-existent evidence.

**E.    Students Are Not Entitled to a Job at Laurelbrook Upon Graduation.**

The District Court heard no evidence that students are entitled to a job after graduation or believe themselves to be so entitled.  The Secretary's only argument under this factor is that sometimes former students do come back to work at Laurelbrook.  Of course a school would be open to hiring its alumni, and it is no surprise that some of the current staff would be former students.  However, having a preference for hiring graduates is not at all the same thing as those graduates' being *entitled* to a job.  The Secretary has not established it would even be possible for Laurelbrook to create enough new

jobs each year for all of its graduates, much less that such a thing has ever happened.

### F. Students Are Not Entitled to Wages for Their Vocational Training.

The Secretary's argument on the final factor is a misunderstanding that, after so many years of being presented with contrary evidence, begins to look deliberate. The Secretary claims that Laurelbrook students receive a scholarship "in direct proportion to their hours worked." Appellant's Brief at 56. There simply is no such connection.

Every resident Laurelbrook student receives a base scholarship. R. 83, Tr. 341:15-18. That scholarship is a fixed amount. R. 83, Tr. 342:3-8. Resident students also receive a second scholarship, the amount of which will vary somewhat from student to student, depending on the student's GPA, R. 83, Tr. 341:24-14, <u>not</u> on hours worked. Laurelbrook determines a student's GPA by averaging academic, vocational, *and* citizenship grades. R. 83, Tr. 341:19-23. While Laurelbrook does fine students for missing class, it applies that rule to academic and vocational classes alike. PX 6 at pp. 11-12, App. at 6-7. A Laurelbrook student, therefore, no more receives "wages" for attending a vocational class than he or she receives "wages" for

attending an English or Social Studies class.  The "direct proportion" that the Secretary claims simply does not exist.

## IV.   The Relief the Secretary Seeks Violates the Free Exercise Clause of the First Amendment and the Religious Freedom Restoration Act.

As noted extensively above, Laurelbrook's reason for existence is its long-standing religious belief, consistent with Seventh-day Adventist teaching, that students need to learn practical skills along with academic subjects.   The Secretary disregards the religious underpinnings of Laurelbrook's program, mischaracterizing Laurelbrook's argument as an excuse to avoid government regulation.  To the contrary, Laurelbrook has never sought to be excused from applicable government regulations, such as state accreditation (which it actively sought).  Rather, it has requested simply that its religious foundation be included in any evaluation of its program. The Secretary has consistently refused to provide any such accommodation.

Under the Religious Freedom Restoration Act (RFRA), the federal government cannot substantially burden a person's exercise of religion, even through a rule of general applicability, except where the government demonstrates that the burden (1) furthers a compelling governmental interest, and (2) is the least restrictive means of furthering that interest.  42 U.S.C. § 2000bb-1.

In addition to RFRA, the compelling interest/least restrictive means standard applies as a constitutional matter in this case, where the religiously motivated action involves not just the free exercise clause, but also the free exercise clause in conjunction with the right of parents to direct the education of their children. *Employment Div. v. Smith*, 494 U.S. 872, 881 (1990) (First Amendment bars application of a neutral, generally applicable law to religiously motivated action that involves the free exercise clause "in conjunction with other constitutional protections, such as freedom of speech and of the press, or the right of parents . . . to direct the education of their children"), *citing*, *inter alia, Pierce v. Society of Sisters*, 268 U.S. 510 (1925) (right of parents to direct children's education).

The evidence presented at trial conclusively established the reality, sincerity, and historicity of Laurelbrook's religious motivations for its vocational school. *Supra*, pp. 3-6. These sincerely held religious beliefs are premised on Laurelbrook's understanding of the Bible and on the teachings of the church's prophetess, Mrs. White. They are consistent with historical Seventh-day Adventist beliefs, as reflected in Mrs. White's writings, in the model of the Madison School founded in the early 1900's (the original pattern for Laurelbrook), and in the emphases of Seventh-day Adventists generally in their worldwide school system. *Supra,* pp. 3-6.

The Secretary offered no substantive challenge to the reality or the sincerity of Laurelbrook's religious motivations. This is not surprising, given the historical record of Seventh-day Adventist education generally and of Laurelbrook specifically for the nearly 60 years of its existence. While Laurelbrook has over time formalized its approach in an accredited vocational curriculum, it is apparent from the testimony of Laurelbrook's very first principal and its current principal that its religious motivations and its essential emphases have remained consistent over the decades. R. 82, Tr. 127:2-23 (Hess); R. 81, Tr. 1178:1-1179:20 (Zollinger).

There are numerous parallels between this case and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), the holding of which the RFRA specifically adopted. 42 U.S.C. § 2000bb(b)(1) ("The purposes of this Act are . . . to restore the compelling interest test as set forth in *Sherbert v. Verner*, 374 U.S. 398 (1963), and *Wisconsin v. Yoder*, 406 U.S. 205 (1972), and to guarantee its application in all cases where free exercise of religion is substantially burdened").

In *Yoder*, the Supreme Court held that Wisconsin's compulsory attendance law could not constitutionally be applied to 14- and 15-year old Amish children who had completed eighth grade. The law conflicted with the Amish religious belief that children of that age, who had already learned

basic academic skills, needed to spend "the crucial and formative adolescent period of life . . . acquir[ing] Amish attitudes favoring manual work and self-reliance and the specific skills needed to perform the adult role of an Amish farmer or housewife."  406 U.S. at 211.

The Supreme Court noted that the Amish approach to education and work succeeded in preparing their high school age children to be productive members of the Amish community.  406 U.S. at 212.  Likewise, Laurelbrook succeeds in preparing its high school age children to be productive members of not only the Seventh-day Adventist community but, unlike the Amish approach, also of the community at large.  Like the Amish system at issue in *Yoder*, Laurelbrook's "system of learning through doing the skills directly relevant to their adult roles in the [Seventh-day Adventist] community [is] 'ideal' and perhaps superior to ordinary high school education."  406 U.S. at 212.

Significantly, the Supreme Court looked favorably on the Amish parents' proposal of a vocational program that involved much more extensive work obligations and much less academic training than does the Laurelbrook program.  *See Yoder*, 406 U.S. at 208 n.3 (three hours of academic training per <u>week</u>, with the balance of the children's time spent on projects in agriculture and homemaking).

As was the case with the state's compelling interest in universal education in *Yoder*, here the federal government's compelling interest in regulating minors' hours and types of work must yield to the interest of parents in directing the rearing of their offspring. 406 U.S. at 213-14, citing *Pierce*, 268 U.S. at 534 (compulsory attendance statute unreasonably interfered with the interest of parents in directing the rearing of their offspring, including their education in church-operated schools); *Ginsberg v. New York*, 390 U.S. 629, 639 (1968) ("constitutional interpretation has consistently recognized that the parents' claim to authority in their own household to direct the rearing of their children is basic in the structure of our society"); and *Meyer v. Nebraska*, 262 U.S. 390, 400-401 (1923) (parochial school teacher's "right thus to teach and the right of parents to engage him so to instruct their children, we think, are within the liberty of the [Fourteenth] Amendment"; "the legislature has attempted materially to interfere . . . with the power of parents to control the education of their own"). *See also Hazelwood School Dist. v. Kuhlmeier*, 484 U.S. 260, 273 (1988) (reiterating the Court's "oft-expressed view that the education of the Nation's youth is primarily the responsibility of parents, teachers, and state and local school officials, and not of federal judges"); *Blau v. Fort Thomas Public Sch. Dist.*, 401 F.3d 381, 395 (6th Cir. 2005) ("For some time and for

considerably longer than most individual constitutional rights have existed, the Supreme Court has recognized a 'fundamental right of parents to make decisions concerning the care, custody and control of their children.'"), *quoting Troxel v. Granville*, 530 U.S. 57, 66 (2000).

The Secretary has made no effort to show either that application of the burden of its child labor provisions to Laurelbrook is in furtherance of a compelling governmental interest or that the relief it seeks is the least restrictive means of furthering that compelling governmental interest, as required by RFRA and the free exercise clause. Her entire argument on this significant issue appears in a footnote. *See* Appellant's Brief at 53 n.17.

The fact that the Secretary does not apply the FLSA to the vocational programs of Tennessee public schools demonstrates either that the federal government does not have a compelling interest in applying the FLSA to vocational school programs or that wholesale application of the FLSA and of the Secretary's regulations is not the least restrictive means of achieving the Secretary's legitimate interests in this area. An obviously less restrictive means of achieving any compelling government interest at stake for the Secretary is to allow TDOE to continue to oversee Laurelbrook, as the Secretary allows for the vocational programs of Tennessee public schools.

The only case on which the Secretary relies regarding the compelling interest/least restrictive means test is *Dole v. Shenandoah Baptist Church*, 899 F.2d 1389 (4th Cir. 1990). But *Shenandoah Baptist Church* did not involve a religious vocational school program or any claim that FLSA applied to the school's students. Instead, the school argued that its adult employees should be exempt from the minimum wage and equal pay provisions of the FLSA on religious grounds. Because the school admitted that it had no religious belief mandating a pay differential based on sex or precluding the payment of the minimum wage (and in fact the school began paying males and females equally and paying minimum wage during the litigation), the Fourth Circuit understandably concluded that any burden on the school's free exercise "would be limited." 899 F.2d at 1397-98. Given the absence of specific religious beliefs regarding the practices in question, the Fourth Circuit concluded that there would be "no principled way of exempting the school without exempting all other sectarian schools," and therefore "a less restrictive means of attaining [the Act's] aims is not available." 899 F.2d at 1398.

Here, by contrast, Laurelbrook's religious beliefs are specific and well-established, and the burden on the exercise of its religion is as severe as

possible – if the FLSA applies to Laurelbrook, it cannot function as an approved vocational school. *See supra*, pp. 12-14.

Moreover, there is clearly a less restrictive means of protecting Laurelbrook's students than mindless application of the Act. The Secretary can and should defer to the TDOE's determination that Laurelbrook is a bona fide vocational school and should allow the TDOE to supervise Laurelbrook as it does every other vocational school in Tennessee.

Accordingly, even if the FLSA applies to bona fide vocational schools (which it does not), and even if Laurelbrook's students are employees rather than trainees within the meaning of the FLSA (which they are not), the Secretary has failed to meet her burden of proving that her actions in this case are the least restrictive means of furthering any compelling governmental interest. Thus, the Secretary's actions wrongfully burden Laurelbrook's free exercise rights in violation of the First Amendment and RFRA.

## V.    The Secretary's Case Does Not Meet the Standard for Injunctions.

The Secretary claims that she needs an injunction because Laurelbrook has no intention of complying with the FLSA if the Court determines that it applies. The Secretary has no evidence supporting that

contention, and Laurelbrook has never expressed any intention of defying any court ruling. The supposed admission that the Secretary cites, testimony from Charles Hess, is simply a discussion of the reality that a program that complies with the FLSA cannot also meet Tennessee CTE guidelines. If the FLSA applies to Laurelbrook, the school will be forced to shut down most, if not all, of its vocational programs. *See supra,* pp. 12-14; R. 77, Laurelbrook PFOF ¶¶ 156-180, App. at 283. Without the hands-on experience that the FLSA prohibits, neither public nor private school schools can meet state CTE standards. R. 80, Tr. 1021:6-9, 1055:5-18, 1056:1-9.

Ironically, Laurelbrook still would be able to require its students to work at the Sanitarium. None of the duties there implicates the hazardous occupations regulations, and the school simply would have to change the hours that its students work. R. 82, Tr. 157:24-158:11; R. 78, Tr. 549:17-25; R. 80, Tr. 957:22-960:3. Thus, if FLSA regulations apply, Laurelbrook would be able to have its students work, but would not be able to teach them any vocational skills. R. 82. Tr. 159:20-22.

Recognizing those facts is not at all the same as planning to defy a court ruling. The Secretary has not demonstrated the need for an injunction.

## CONCLUSION

The Secretary's appeal is based on a myopic view of the operative facts and a blithe disregard of precedent and common sense. Laurelbrook is an accredited school with an approved vocational program. Its students are simply vocational school students, not employees. The Secretary's position has no support in the record, in contrast with the overwhelming factual support for Laurelbrook's position and the District Court's findings of fact. For more than 50 years, Laurelbrook Sanitarium and School has followed its religiously based educational philosophy. As times changed, Laurelbrook was able to adapt its program to modern sensibilities and has gone to extensive lengths to bring its curriculum in line with Tennessee education standards. It retains its distinctive character, but is nevertheless a *bona fide* educational institution. As such, it is no more within the Secretary's jurisdiction than any other vocational program in the state.

Even if Laurelbrook were not a valid vocational program, the benefits the students receive, in both vocational skills and character training, far outweigh any tangential benefit the school receives. Even under the Secretary's mistaken restrictive framework, Laurelbrook's training falls squarely within the six-part test for training programs. Accordingly, the school is not an employer subject to the FLSA.

Finally, the school's religious character deserves respect and constitutional protection. The Secretary has not shown that shutting down Laurelbrook's vocational program is the least restrictive means of keeping students safe. Indeed, hundreds of schools throughout the state operate safely without oversight from the Secretary. The Secretary simply has not presented a compelling interest that can be served only by depriving Laurelbrook of its hard-earned approval from the Tennessee education authorities.

For the foregoing reasons, this Court should affirm.

Respectfully submitted, April 7, 2010.

FSB FISHER BROYLES
a Limited Liability Partnership


s/  Deborah Ausburn
Deborah A. Ausburn

2016 Bascomb Carmel Road
Woodstock, GA 30189
(678) 494-6199

David J. Myers

21460 Crabapple Road
Suite 202-196
Alpharetta, GA  30004-6386
(404) 825-3907

COUNSEL FOR APPELLEE

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 37(a)(7)(C) and Circuit Rule 32(a), I certify the following with respect to the foregoing brief of the Defendant-Appellee Laurelbrook Sanitarium and School, Inc.:

1.      This brief complies with the type-volume limitation of Fed. R. App. 32(a) (7) (B) because this brief contains 13,994 words, excluding the parts of the brief of the brief exempted by Fed. R. App. P. 32(a) (7) (B) (iii).

2.      This brief complies with the typeface requirements of Fed. R. App. 32(a) (5) (B) and the type style requirements of Fed. R. App. P. 32(a) (6) because this brief has been prepared in a proportionally spaced typeface in Times New Roman 14-point type style.  The brief was prepared using Microsoft Office Word 2008 for Macintosh.


April 7, 2010                          s/ Deborah A. Ausburn

                                       DEBORAH A. AUSBURN
                                       Attorney for Defendant-Appellee

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on this 7th of April, 2010, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit by using the CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.


April 7, 2010                            s/ Deborah A. Ausburn

                                         DEBORAH A. AUSBURN
                                         Attorney for Defendant-Appellee

# **ADDENDUM**

## DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS PURSUANT TO LOCAL RULES 30(b) AND 30(f)(1)

A.    R. 1; February 12, 2007; Complaint

B.    R. 77; June 17, 2009; Proposed Findings of Fact by Laurelbrook Sanitarium and School, Inc.

C.    R. 84, 85; July 15, 2009; Memorandum and Order of Hon. Curtis L. Collier, Chief Judge, Eastern District of Tennessee

D.    See Section C above

E.    R. 87; September 11, 2009; Notice of Appeal

F.    Transcripts

    a.    R. 82; Transcript (redacted) of Day One of Bench Trial, August 19, 2008

    b.    R. 83; Trancript (redacted) of Day Two of Bench Trial, August 20, 2008

    c.    R. 78; Transcript (redacted) of Day Three of Bench Trial, March 30, 2009

    d.    R. 79; Transcript (redacted) of Day Four of Bench Trial, March 31, 2009

    e.    R. 80; Transcript (redacted) of Day Five of Bench Trial, April 1, 2009

    f.    R. 72; Transcript (unredacted) of Day Six of Bench Trial, April 2, 2009

    g.    R. 81; Transcript (redacted) of Day Seven of Bench Trial, April 6, 2009